612 A.2d 998

**Debra SONCINI, Appellant,**

v.

**Dale A. SONCINI, Appellee.**

Superior Court of Pennsylvania.

Argued March 5, 1992.

Filed July 8, 1992.

394

Mary E. Baloh, Greensburg, for appellant.

Jay A. Blechman, Pittsburgh, for appellee.

Before DEL SOLE, JOHNSON and FORD ELLIOTT, JJ.

DEL SOLE, Judge.

This is an appeal from the trial court's order granting a Appellee/Father's petition for modification of child support, and denying Appellant/Mother's petition for reinstitution of alimony. A history of the proceedings in this case is essential for an understanding of the issues raised.

The parties were married in May of 1982 and separated in 1986. They were divorced on January 17, 1990. They have one child, Natalie, born in April, 1984 with a rare incurable disease called congenital hyperplasia syndrome. This disease is caused by the malfunctioning of the adrenal glands resulting in an inability to retain sodium and water, virilization, ambiguous genitalia, and at the time of the hearing, a failure to sustain normal growth. The child requires, and will require, daily medication as well as emergency injections when she runs a fever associated with viral infections. She has several allergies, and reacts unfavorably to certain antibiotics used to treat her when she contracts an infection. Because of her inability to retain sodium and water, she is subject to rapid dehydration in response to physical illnesses and emotional distress, and when this occurs she often needs hospitalization. Normal childhood illnesses are a sufficient threat to Natalie's health to require hospitalization.

Mother, Debra M. Soncini, has primary physical custody of Natalie, and during the marriage it was the parents' joint decision that Debra Soncini would stay home to raise Natalie because of the child's chronic illness. Debra Soncini has an undergraduate degree in business management, and prior to Natalie's birth she was employed by Honeywell Corporation earning approximately $20,000. The relations between the parents since the separation and divorce have

been contentious at best, and at one point the court remarked that it was clear that the parties "loathe" each other. This has resulted in numerous charges and counter charges concerning Father's partial custody arrangements, with concomitant contempt charges for violations of the custody order, and charges of mistreatment by Father. At one point, counselling was ordered by the court because of the effect these recriminations were having on Natalie.

Prior to the proceedings in the trial court resulting in this appeal, the support order in place required that Father pay $475.00 per month in support for Natalie. The trial court, despite the recommendations of the Master concerning equitable distribution and alimony, ordered that the same amount be paid in spousal support, "for a period of one (1) year or until such time as the plaintiff is gainfully employed whichever date occurs first." It is not entirely clear from the record how the child support figure was arrived at, but it may be assumed from the expense sheets and tax forms submitted by the parties, that the factors which go into the application of the *Melzer* formula were considered. Because of Father's failure to live up to his support obligations, there have been several contempt proceedings and wage attachments to enforce the support order.

In January, 1990 Father petitioned to modify the support order based on an averment that his income had decreased. However, because both parties had filed cross appeals to this court from the divorce decree and order in equitable distribution and alimony, the trial court ordered that no hearing date would be set until the Superior Court had ruled on the appeal.

Subsequently, this court affirmed the trial court. We held that the trial court had not abused its discretion in limiting the duration of the alimony award to Mother, and concluded that the limitation did not foreclose Mother's right to a future hearing on the reinstitution or modification of the alimony award. *Soncini v. Soncini*, 407 Pa.Super. 655, 584 A.2d 1055, (1990). In April, 1991, Mother filed a Petition Seeking Continuation and/or Reinstitution of Ali-

mony and a combined hearing on this Petition and Father's Modification of Support Petition was held. The trial court ruled that alimony should not be reinstituted and that child support should be reduced to $350.00 per month. This appeal followed.

Initially, Mother urges this court to reverse the trial court's order decreasing child support from $475.00 per month to $350.00 per month on two bases. First, she argues that Father failed to show a change of circumstances sufficient to modify the support order, and secondly she argues that the trial court failed to take in to account extraordinary circumstances, and instead merely applied the grid/support guidelines. We will discuss both these claims seriatim.

When a party seeks to modify a child support order, the moving party has the burden of proving by competent evidence that a material and substantial change of circumstances has occurred since the entry of the original or modified support order. *Commonwealth ex. rel. Sladek v. Sladek*, 386 Pa.Super. 490, 492, 563 A.2d 172 (1989). We will not disturb a child support order unless the trial court, in determining the amount of support, has abused its discretion, and where the moving party's burden of proof has not been met, an abuse of discretion will be found. *Id.*, 386 Pa.Super. at 493, 563 A.2d 172; *Steenland–Parker v. Parker*, 375 Pa.Super. 457, 460, 544 A.2d 1010, 1012 (1988).

Father moved for modification of child support based on decreased earnings. Instantly, the record reveals that in 1988 when the child support order of $475.00 was entered, Father earned approximately $30,000 per year, and at the time of the hearing, he stated he earned in 1990, about $35,000 per year. Father also stated that since 1988 he had gradually increased his wages. (N.T. at 98, May 28, 1991). Mother started working in February, 1990, four months prior to the hearing, and she grosses about $370.00 per month or $4,500 per year. (N.T. at 44, May 28, 1991).

In sum, the record does not support Father's claim that modification of support is required because of decreased earnings. Moreover, Father failed to show that he had increased expenses, rather, the record shows that Father is now living with his fiancee who is gainfully employed by Westinghouse and contributing to the household expenses. (N.T. at 100, May 28, 1991).

We have stated that, "a Court may only modify an existing support award when the party requesting the modification shows a material and substantial change in circumstances since the Order was entered." *Commonwealth ex rel. Vona v. Stickley,* 287 Pa.Super. 296, 299, 430 A.2d 293, 295 (1981), *cited in, Bradley v. Bradley,* 387 Pa.Super. 503, 564 A.2d 504, 506 (1989). Here, the trial court failed to explain and the record does not reveal how there has been a material change of circumstance since the 1988 order was entered. While it is true that since the entry of the 1988 support order, Mother has begun to work part-time, her income (approximately $4,500 per year), balances out Father's increased earnings of approximately $5,000 per year, and therefore does not show a substantial change of circumstances. Moreover, this would certainly not warrant a downward revision of the support award.

We therefore hold that Father has failed to meet his burden of proving a material and substantial change in the circumstances of the parents, and therefore a modification of the support order was unwarranted.

The trial court arrived at its support award by applying the guideline grid to the net income of Father ($1,849.00 per month) and imputing $500 of net income per month to Mother, although she presently earns only a little over half of that amount. The trial court stated, "an Order of $333.00 is suggested. Based on all factors, this Court concluded that the original Order of December 18, 1990 [for $350.00] is appropriate so long as Defendant contributes to Natalie's extraordinary medical expenses and maintains health insurance coverage for the child." (Trial Court Opinion at 3, July 16, 1991).

■ We disagree. With the enactment of the guidelines, the trial court's decisional process has been restructured. In guideline cases, we first look to determine if the court correctly computed the parties' incomes. We must next determine if the correct guideline amount was selected. However, it must be stressed that "the support guidelines are a starting point only. They must be applied taking into consideration the special needs and obligations of the parties." Pa.R.Civ.P. 1910.16–4(a). Therefore, where a trial court is asked to consider a departure from the guidelines based upon the unique needs of either the child or the obligor parent, we must examine the court's reasons for ordering departure or for refusing to take such action.

■ In the instant case, it was undisputed that there were extraordinary expenses involved in caring for Natalie. Mother must travel to Pittsburgh for doctors' appointments seven times per month. Although Father testified he would be willing to drive Natalie to the doctors, he also stated that he works five to six days a week, returning home at the earliest at 6 P.M. Because all of these doctors' appointments must be scheduled on weekdays between 9 and 5 o'clock, it is not realistic to expect that he would be able to fulfill this offer. Mother calculated her reasonable travel expenses for these doctors' visits to be $164.00. This figure was undisputed.

It was also undisputed that Natalie was ill approximately 5 days per month, and Mother's income at her part time job was reduced accordingly. Mother must also must pay for psychological treatment (approximately $64.00 per month) for Natalie because of the issues surrounding the virilization or masculinization Natalie experiences because of the disease. None of these extraordinary expenses were disputed, and yet the trial court failed to give reasons for disregarding them and strictly adhering to the guidelines.

The statute mandating enactment of state-wide support guidelines provides in pertinent part that, "the guideline shall place primary emphasis on the net incomes and earning capacities of the parties, with allowable deviations for

unusual needs, extraordinary expenses and other factors, such as the parties' assets, as warrant special attention." 23 Pa.C.S. § 4322(a). Because the guidelines must be tempered by individual treatment in order to make adjustments for exceptional circumstances, *Ryan v. DeLong*, 371 Pa.Super. 248, 538 A.2d 1, 3, (1987), the guideline rules provide a list of the relevant factors that the court and hearing officers must consider after determining the basic amount from the grid. Rule 1910.16–5, Pa.R.C.P., 42 Pa.C.S.A. These include unusual needs and unusual fixed obligations, other income in the household, ages of the children, medical expenses not covered by insurance, and other relevant and appropriate factors.

The trial court does not discuss its reasons for refusing to consider these undisputed exceptional needs and the related expenses. Because these factors must be considered when the trial court or the hearing officer arrives at a support award, and because the trial court gives no reasons for its refusal to deviate from the guideline amount in this case, we find that the court erred in its calculation of the amount of the support order.

Since we have concluded above that the court abused its discretion in ordering the downward modification of the prior child support award of $475.00, because Father failed to show a material and substantial change of circumstances, and since the trial court further compounded its error when formulating a new award by using the grid system but failing to consider exceptional circumstances as required by statute, we vacate the court's most recent child support order and reinstate the original award of $475.00.

■ Next, Appellant contends that alimony should have been reinstituted. This court, in reviewing the original alimony award, which was limited to one year's duration, held, in accordance with section 501(e) of the Divorce Code, [repealed, now 23 Pa.C.S.A. § 3701(e) ], that the Wife may seek modification of the alimony order upon a requisite showing of "changed circumstances ... of a substantial and

continuing nature." *Soncini v. Soncini,* 407 Pa.Super. 655, 584 A.2d 1055, *supra.*

In denying Wife's petition for reinstitution of alimony, the trial court stated that, "the testimony heard before this Court on Plaintiff's Petition regarding alimony indicates that there has not been a showing of changed circumstances. The tragic medical condition of Natalie has persisted since her birth and continues to be of grave concern. Equally unchanging is the fact that Plaintiff must work in order to help meet her needs and those of the child." (Trial Court Opinion at 2, July 16, 1991).

Dr. Debra Rosenstein, Natalie's pediatric endocrinologist, testified that in the three months prior to the hearing Natalie had failed to grow. (N.T. at 15, May 28, 1991). The doctors were having trouble determining the dosage of the hormone she must take three times daily at 8 hour intervals. The doctor testified that when enough hormone was given to control the masculinization (hair growth, acne etc.), Natalie failed to grow, but when the hormone dosage was cut down, Natalie began to masculinize. The doctor stated that this swing had been going on from about October, 1990 until the date of the hearing in May, 1991, and that she had informed Mother that unless this was brought under control they would have to hospitalize Natalie. The real potential for hospitalization was a recent development due to Natalie's growth failure. (N.T. at 13–15, 34, 41, May 28, 1991). When the doctor was asked on cross-examination, "There has been no new condition that you have identified in Natalie in the time that you have seen her; is there?" The doctor responded, "Incorrect. I explained that she's exhibiting growth failure. That has not been seen before." (N.T. at 41, May 28, 1991).

Dr. Rosenstein was also asked about the particular obligations of a parent who has a child with Natalie's condition. She responded that the parent has to be taught a "certain degree of medical judgment," involving when to triple the dose if the child has a fever, how to give injections, and what sort of medical attention to get when the child vomits.

She also stated that the normal occurrence of childhood diseases, which is more frequent with little children, "become crises situations in the family where there is a child with adrenal hyperplasia." "So this not a question of knowing when you take your pill. It's a question of understanding the entire process." (N.T. at 26–27, May 28, 1991). The doctor further opined that a substitute caretaker's qualifications would have to be the same as the parent's, that is the caretaker would have to know how to respond to any childhood illness, know who to call, where to take the child, and give an injection. (N.T. at 27, May 28, 1991).

Mother testified that she sent the child to a neighborhood public school. There was no full time school nurse, and none of the teachers could give injections, so that when Natalie fell ill, she had arranged to be called immediately. She was able to leave her job at a moment's notice because the hardware store was owned by friends. She also became a room mother in Natalie's classroom in order to go on the class field trips with Natalie. Previously, Natalie has been excluded from in the field trips because neither Mrs. Soncini nor any other medically qualified chaperone was available. In the previous five months, Natalie missed 24 days of school due to illness, and Mrs. Soncini was called to the school at least once a month during the last six months due to illnesses. (N.T. 53–57, May 28, 1991).

Mother ran an advertisement in the local paper to find a caretaker for Natalie with the qualifications specified by Dr. Rosenstein and received no replies. She also called an agency which told her that the least expensive caretaker with those qualifications would charge $13.50 per hour. (N.T. 57–58, May 28, 1991). Mother stated that because of her inability to find reasonably priced and suitable caretakers who could care for a child with Natalie's condition, her recurrent illnesses, and her recent failure to grow, probably necessitating hospitalization in the near future, she could not take a full time job at the present. (N.T. 59, 61, May 28, 1991).

Mother stated that she was asking for alimony to help sustain the care of her child. When she was asked whether she hoped that by 10 or 11 years old, Natalie would be more autonomous, Mother replied, "I hope that the doctors will be able to get Natalie's health under control sooner than that for Natalie's sake as well as for all of us, but until they can actually get Natalie's health under control it seems to be getting more serious as the years go on." (N.T. at 66, May 28, 1991).

The uncontroverted evidence presented at trial concerning Natalie's deteriorating medical condition, her recurrent illnesses, her inability to sustain normal growth without masculinization occurring, her doctor's concern that hospitalization was necessary to stabilize Natalie, Mother's need to participate more fully in Natalie's school than originally anticipated in order to give Natalie a chance for a normal school experience, are all indications of changed circumstances of a substantial and continuing nature.

■ The trial court failed to discuss any of this evidence of changed circumstances. It is clear from the record that Mother can not meet her expenses based on her earnings alone, but the trial court denied the petition for reinstating alimony, focussing instead on the Mother's need to work, Natalie's attendance at school and the possibility that caretakers can be trained to take care of Natalie. However, we have held that although a dependent spouse should seek employment commensurate with his/her earning potential, a spouse may equally limit working hours to in order to care for his/her children. *King v. King*, 390 Pa.Super. 226, 568 A.2d 627 (1989).

■ In the context of child support we have stated: The court must balance several factors before it can expect the nurturing parent to seek employment. Among these factors are the age and maturity of the child: the availability and adequacy of others who might assist the custodian-parent; the adequacy of available financial resources if the custodian-parent does remain at home. We

underscore that, while not dispositive, the custodian-parent's perception that the welfare of the child is best served by having a parent at home is to be accorded great weight in the court's calculation of its support order. *Com. ex rel. Wasiolek v. Wasiolek*, 251 Pa.Super. 108, 380 A.2d 400 (1977).

The trial court made no attempt to even discuss these factors, when it held, in effect, that Mother must obtain full-time employment commensurate with her earning potential. In *King, supra*, 390 Pa.Superior Ct. at 230–231, 568 A.2d at 629, this court upheld a trial court's decision not to attribute unused earning capacity in formulating a spousal support award when Mother testified that she worked a limited schedule and for a lower rate of pay than she otherwise would because doing so enabled her to have the time and flexibility of schedule she needed to care for her children. We also held in *Wasiolek, supra*, 251 Pa.Superior Ct. at 111, 380 A.2d at 402–403, that the trial court abused its discretion when it held, in effect, that the nurturing parent must secure employment, despite the mother's testimony that she was needed at home to care for her three children when they left for school and returned home in the afternoon. *Wasiolek, supra*, 251 Pa.Superior Ct. at 111, 380 A.2d at 402–403.

The circumstances of the instant case indicate a much greater need for a parent who has the time and flexibility to care for Natalie in emergencies, take her to her many doctor's appointments, and be able to stay home with her during her many illnesses. The attribution of unused earning capacity to Mother, which has the effect of ordering her to find full-time employment was thus clearly an abuse of discretion.

We therefore reverse the trial court's order denying the reinstitution of alimony on the basis that Mother has clearly shown changed circumstances of a continuing and substantial nature. We remand for the fashioning of an order which assures a reasonable living allowance to the party requiring support and is also fair and not confiscatory, allowing for the reasonable living expenses of the payor.

*Marshall v. Marshall,* 404 Pa.Super. 628, 591 A.2d 1060 (1991)

We therefore vacate the trial court's order decreasing child support to $350.00, and reinstate the original support order of $475.00. We also reverse the court's order denying Appellant's petition for reinstitution of alimony, and remand for the fashioning of a alimony award in accordance with this opinion. Jurisdiction is relinquished.